IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2013 AUG 30  PM 3: 09

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

EASTMAN CHEMICAL COMPANY,
               Plaintiff,

-vs-                                                    Case No.  A-12-CA-057-SS

PLASTIPURE, INC. and CERTICHEM, INC.,
               Defendants.

_____

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants PlastiPure, Inc. and CertiChem, Inc.'s Motion for Judgment as a Matter of Law [#185], and Plaintiff Eastman Chemical Company's Response [#189]; Eastman's Motion for Entry of Final Judgment [#204], Defendants' Response [#209], and Eastman's Reply [#214]; Defendants' Motion for Judgment [#205], Eastman's Response [#211], and Defendants' Reply [#215]. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

In this Lanham Act false advertising case, Eastman alleged Defendants made false and misleading statements about an Eastman product, a plastic resin known as Tritan. Specifically, Eastman claimed Defendants incorrectly stated Tritan, or products made from Tritan, leached chemicals capable of causing estrogenic activity when subjected to various stressors, and those estrogenic chemicals could cause harm to humans. A jury trial was held from July 15, 2013 to July

24, 2013. After approximately three to four hours of deliberation, the jury returned a verdict and found in favor of Eastman on every question.

At the close of Eastman's case-in-chief, Defendants filed their motion for judgment as a matter of law, which the Court carried. After the jury returned its verdict, the Court instructed the parties to file proposed final judgments. The parties' respective motions, proposed judgments, and assorted briefs are now submitted, and the issues are ripe for adjudication.

## Analysis

### I.     Defendants' Motion for Judgment as a Matter of Law

### A.     Legal Standard

"Under the standard articulated in FED. R. CIV. P. 50(a), a district court properly grants a motion for judgment as a matter of law only when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue.'" *Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 582–83 (5th Cir. 2002) (quoting FED. R. CIV. P. 50(a)). In order to submit an issue to the jury, "the evidence must be sufficient so that [the] jury will not ultimately rest its verdict on mere speculation and conjecture." *Id.* The court considers "all the evidence presented at trial in the light most favorable to the non-moving party." *Id.*

### B.     Application

To succeed on a false advertising claim under section 43(a) of the Lanham Act, a plaintiff must establish the following five elements:

> (1) A false or misleading statement of fact about a product;
> (2) Such statement either deceived, or had the capacity to deceive a substantial segment of potential consumers;
> (3) The deception is material, in that it is likely to influence the consumer's purchasing decision;

(4) The product is in interstate commerce; and

(5) The plaintiff has been or is likely to be injured as a result of the statement at issue.

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000). Defendants offered a plethora of arguments in support of their motion,[1] but none justified taking the ultimate questions away from the jury.

First, Defendants argued there was no evidence they were "in commercial competition" with Eastman, a requirement drawn from section 43(a)'s "commercial advertising or promotion" language. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1382–84 (5th Cir. 1996). This argument is both conclusory and patently false. Defendants' common founder and "Chief Scientist," Dr. George Bittner, testified Defendants were developing a plastic resin to compete with Tritan, and that such a product may or may not be ready to market. Although Dr. Bittner expressed a surprising amount of confusion about what actually goes on at the companies he owns, his testimony alone provided sufficient evidence from which a jury could conclude Defendants were in commercial competition with Eastman. Defendants also published a brochure in which they compared test results from products made with Tritan to their own in-house brand of plastic, further suggesting direct competition between the parties. Finally, Defendants' general business practice of certifying plastic products as "EA-free" directly impacts Eastman's business. *See Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 463 (5th Cir. 2001) (jury "could have inferred that the parties were competitors" based on plaintiff's "direct business interest" in relevant market and defendants' advertisements in the same market).

---

[1] Some arguments raised by Defendants were ultimately mooted by the Court's actual jury instructions and verdict form, which listed three specific statements alleged to be false or misleading. The Court will not address Defendants' objections aimed at statements not put before the jury.

Second, Defendants contended they made no statements of fact about Tritan. "[A] statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification." *Pizza Hut*, 227 F.3d at 496 (internal quotation marks omitted). Defendants contend their statements about Tritan are matters of scientific debate protected by the First Amendment and are therefore per se not actionable, citing *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013).

*ONY* does not control this case.[2] Most obviously, *ONY* is factually distinguishable because the plaintiff there sued over conclusions drawn in a published article in a peer-reviewed scientific journal. *Id.* at 496–98. In essence, the plaintiff believed the defendants had reached an incorrect result based on the data collected and reported in the paper. The Second Circuit concluded "the article's contents [were] not actionable" because the paper disclosed the data, weaknesses of the experiments, and potential conflicts of interest, thereby giving the scientific audience adequate information to analyze and accept or reject the authors' conclusions. *Id.* at 498.[3] By contrast, Eastman did not sue Defendants over Dr. Bittner's scientific paper, which was also published in a peer-reviewed scientific journal. Instead, Eastman's false advertising claims are based on non-scientific materials, such as an advertising brochure, press releases, and Defendants' website,[4] none of which included the full context of the scientific paper, and some of which pre-dated the publication of Dr. Bittner's paper. The "scientific debate" in this case moved from the pages of

---

[2] *ONY* is, of course, not binding on this Court, and cited no Fifth Circuit authority.

[3] The Second Circuit also concluded "the secondary distribution of excerpts of such an article cannot give rise to liability, so long as the excerpts do not mislead a reader about the conclusions of the article." *ONY*, 720 F.3d at 492.

[4] The jury's instructions, and Eastman's counsel's closing arguments, directed the jury's attention to these commercial advertisements, not to Dr. Bittner's paper.

academic journals to commercial advertisements targeted at consumers. Although the jury heard from a dizzying number of experts and was subjected to hours upon hours of complex scientific testimony, often with little to no interpretive assistance from counsel, this case was ultimately nothing more than a battle of the experts in which the jury was properly tasked with crowning a victor. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) (recognizing the traditional tools of the adversary system are adequate to allow juries to assess even complex scientific evidence); *see also Davis v. Duran*, 277 F.R.D. 362, 366 (*Daubert* "reaffirmed . . . the capability of juries to understand scientific evidence and weigh the credibility of the competing experts, notwithstanding their contradictory conclusions and dogmatic assertions" (internal quotation marks omitted)).[5]

Third, Defendants argued there was no evidence from which the jury could reasonably conclude the statements "Tritan has EA"[6] or "Tritan has EA and is thus harmful to human health"[7] were false. To the contrary, the jury heard extensive evidence, including expert testimony, indicating

---

[5] The classification of this case as a typical battle of the experts was confirmed at trial when the parties allowed every witness offered as an expert to testify as such without objection, despite the filing of a mountain of *Daubert* motions pre-trial. The *Daubert* motions were universally dismissed without prejudice to re-raising the objections at trial, as is the Court's standard practice.

[6] The parties debated the applicability of the so-called "tests prove" theory of liability—which has not been adopted by the Fifth Circuit—under which a plaintiff must prove the tests supporting the defendant's statements "are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made." *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) (internal quotation marks omitted). The Court did not instruct the jury on the "tests prove" theory, so Defendants' objections on this basis are moot.

[7] The parties similarly debated the applicability of the "false by necessary implication" doctrine, which the Court did include in its instructions to the jury. *E.g.*, *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1367 (Fed. Cir. 2013). Defendants contend they are entitled to judgment as a matter of law on this theory as to the "Tritan is harmful" claim because Defendants' statements were ambiguous, as evidenced by a survey conducted by Eastman's marketing expert in which some relatively small percentage of those surveyed claimed the "Tritan is harmful" statement was true. But the mere fact not everyone who read the materials believed "Tritan is harmful" was a true statement does not mean the message conveyed was ambiguous. Defendants' advertisements clearly and unambiguously stated (1) Tritan has EA, and (2) EA is harmful. From those two statements, a reasonable jury could conclude Defendants implied the false message that Tritan is harmful.

Tritan did not exhibit estrogenic activity or leach chemicals capable of causing estrogenic activity after being subjected to common-use stressors. This evidence included discussions of Eastman's own testing of Tritan's components, as well as criticisms of the testing done by Defendants. With respect to the "Tritan is harmful" claim, it was essentially undisputed there was no evidence to support the claim that Tritan is actually harmful to humans: the expert witnesses on both sides universally refused to make such a claim, and even PlastiPure's CEO admitted he could not definitively say Tritan (as opposed to EA in the abstract) is dangerous.

Fourth, Defendants argued there was no evidence Eastman's customers were actually deceived, an element Eastman must prove if a statement is deemed misleading. But the jury heard from numerous Eastman customers who expressed concern about the statements Defendants were making, even if their concerns were ultimately assuaged by Eastman. Additionally, Eastman presented testimony from a marketing expert who conducted a survey of plastic-product purchasers and concluded a statistically significant amount of those surveyed believed various (allegedly false or misleading) statements made by Defendants. While the jury had numerous reasons to discount or disregard entirely the expert's survey results—such as her acknowledgment she did not survey Eastman's actual customers, and her inability to explain her statistical analysis—the jury was presented with some evidence which could have supported a finding of actual deception.[8]

Fifth, Defendants argued there was no evidence Eastman's customers' purchasing decisions were likely to be influenced by any misleading statements, and thus the "materiality" element is not satisfied. Once again, the jury heard some evidence, in the form of the marketing expert's survey as

_____

[8] Because the jury ultimately concluded all three statements made by Defendants were false, in addition to misleading, deception is presumed. *Pizza Hut*, 227 F.3d at 497.

well as testimony about Eastman's customers' behavior in response to Defendants' advertisements. While a jury was certainly not required to find materiality, there was some evidence to support such a finding.[9]

Sixth, Defendants argued there was no evidence of injury to Eastman. Defendants' one-sentence argument ignores the evidence of deception and materiality described above, as well as evidence showing the expenses Eastman incurred for corrective advertising.

Seventh, Defendants argued their press releases and website statements do not constitute commercial advertisements or promotions under the Lanham Act, and therefore offer no basis for liability. "Courts have applied the Lanham Act to just about every imaginable print and media form, including press releases, print ads, posters, and websites." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F.2d 384, 462 (D.N.J. 2009) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 585–86 (3d Cir. 2002)). Defendants' press releases and website statements were clearly designed to bolster Defendants' image and reaffirm Defendants' primary business strategy; in other words, to "influenc[e] consumers to buy defendant's goods or services," namely Defendants' "safer" plastic alternatives as well as their testing and certification services. *Seven-Up*, 86 F.3d at 1384.[10]

Defendants' Rule 50 motion failed to show there was "no legally sufficient evidentiary basis" for the jury to find in favor of Eastman on the various issues raised. *See* FED. R. CIV. P. 50(a).

---

[9] As with deception, because the jury ultimately found Defendants' statements were false, materiality is presumed. *Pizza Hut*, 227 F.3d at 497.

[10] Defendants also argued their website statements were not actionable because they did not specifically reference Tritan. The verdict form instructed the jury to consider only those statements which were about Tritan itself. Moreover, the jury heard sufficient evidence to infer more generalized statements were part of an implied message about Tritan (e.g., "Tritan has EA" and "EA is harmful," therefore "Tritan is harmful").

Accordingly, judgment as a matter of law was not warranted and the factual issues were properly submitted to the jury for a final determination.

## II.      Motions for Entry of Final Judgment

## A.      Defendants' Rule 50(b) Motion

Though styled simply as a "Motion for Judgment," Defendants' motion in part challenges the sufficiency of the evidence to sustain the jury's verdict. Accordingly, the Court will construe those portions of the motion as a Rule 50(b) renewed motion for judgment as a matter of law. Applying Rule 50(b), the Court is "obligated to accept the findings of the jury unless the facts point so overwhelmingly in favor of one party that no reasonable person could arrive at a different conclusion." *Pizza Hut*, 227 F.3d at 500. The Court construes all evidence "the way that is most favorable to upholding the verdict." *Id.*

Defendants' burden is an important one in this case, as the jury heard days of contradictory testimony from world-class scientists as well as lay witnesses. At various times, each side presented compelling arguments on small sub-issues throughout the case. At other times, each side's witnesses fell flat. The jury watched attentively and took notes, and no doubt made numerous judgments about the credibility of the witnesses and the importance to assign to each piece of evidence. Faced with so much contradictory evidence, virtually any verdict the jury reached would have been sustainable, as reasonable jurors could disagree about countless facts, inferences, and conclusions. Bearing in mind Defendants' obligation to show "no reasonable person" could arrive at the conclusions this jury did, the Court turns to Defendants' arguments. *See id.*

First, Defendants re-urge their First Amendment argument based on *ONY*. For the reasons already discussed, this argument is rejected. Defendants refuse to acknowledge the critical factual

distinction between suing someone for publishing an academic paper and suing someone for making statements in a commercial advertisement, even if those statements are based on a peer-reviewed study. *See ONY*, 720 F.3d at 496–97 (when "the trial of ideas plays out in the pages of peer-reviewed journals . . . the scientific public sits as the jury"). The Second Circuit's holding in *ONY* clearly took this distinction into consideration: "when the conclusions reached by experiments are presented alongside an accurate description of the data taken into account and the methods used, the validity of the authors' conclusions may be assessed on their face by other members of the relevant discipline or specialty." *Id.* at 497–98. This lawsuit is not about Dr. Bittner's scientific paper. It is about statements made in commercial advertisements or promotions, not statements made in a peer-reviewed journal. It is about statements made to consumers, not scientists. It is about statements made without the necessary context presented by a full scientific study, such as a description of the data, the experimental methodology, the potential conflicts of interest, and the differences between raw data and the conclusions drawn by the researcher. Those differences are crucial, and Defendants' repeated refusal to engage them reveals their reliance on *ONY* as last-minute revisionist history based on a decision published only two weeks before this case went to trial.

Defendants seek to immunize themselves from all liability simply because scientists disagree about (1) the definition of estrogenic activity; (2) whether estrogenic activity can be conclusively detected using an MCF-7 in vitro assay; and (3) whether EA detected using an MCF-7 assay is dangerous to human health. Even if it were binding on this Court, *ONY* would not require such a result. *ONY* merely recognizes scientists must be free to have such debates within the scientific community without fear of being sued for making "false" statements. *See Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) (affirming summary judgment in favor of scientists accused of

defaming the plaintiff-scientist by reporting results of their study debunking the plaintiff-scientist's work); *ONY*, 720 F.3d at 497 (citing approvingly to *Underwager*). Dr. Bittner was not sued for publishing his paper. Instead, his companies were sued when they transformed snippets of his paper—a paper which never mentions Tritan or Eastman by name—into commercial advertisements claiming Tritan is harmful whereas Defendants' certified EA-free products are safe.

Defendants' reading of *ONY*, taken to its logical conclusion, would eviscerate the Lanham Act. For the right price, an expert can be found to offer virtually any opinion on any given subject. *See, e.g.*, *Underwager*, 22 F.3d at 731 (plaintiff-scientist frequently testified as an expert that "most accusations of child sexual abuse stem from memories implanted by faulty clinical techniques rather than from sexual contact between children and adults"). Defendants would immunize from liability all statements made concerning subjects over which two scientists disagreed, thus making the issue one of "scientific debate." The courts are full of cases in which experts on each side disagree about a particular topic. The role of the jury is to consider the evidence, evaluate the credibility of the witnesses, and render a decision. Our system does not prevent juries from deciding issues simply because highly qualified experts disagree. In this case, the jury necessarily made numerous credibility determinations in evaluating the scientific testimony offered by both parties. It concluded Defendants falsely claimed Tritan and its products exhibit estrogenic activity and are harmful. The jury's conclusion is no less valid simply because the questions it was asked to answer were difficult or technically complex.

The jury found Defendants made three false statements: (1) Tritan has EA; (2) Tritan is dangerous; and (3) Tritan exhibits EA when subjected to "common use" stressors. The jury's verdict rests on adequate evidentiary grounds with respect to all three statements. It was the jury's task to

evaluate the credibility of the witnesses and weigh the competing claims. For example, the jury was likely unimpressed with Dr. Bittner's combative demeanor and testimony. After analyzing all of the evidence, a reasonable jury could have found Defendants' tests for EA were not adequate to conclusively prove the Tritan resin Eastman ships from its plants exhibits estrogenic activity. Similarly, a reasonable jury could have concluded there was no evidence Tritan was actually harmful, especially because this point was essentially undisputed: nobody was willing to testify Tritan was actually dangerous to humans. A reasonable jury could also have found Defendants' chosen stressors were not "common use," despite being described as such, because they did not simulate realistic exposure conditions for Tritan products. A different jury on a different day may have reached a different conclusion, but that does not diminish the validity of the jury's verdict in this case.

Second, Defendants re-urge their argument they are not in commercial competition with Eastman. As noted above, this argument simply ignores the evidence presented at trial, including testimony from Dr. Bittner about Defendants' efforts to create an alternative to Tritan.

Third, Defendants for the first time argue Eastman lacks prudential standing to sue under the Lanham Act. The Fifth Circuit has held "only persons who have suffered a commercial injury as a result of anti-competitive conduct have prudential standing to sue under the Lanham Act." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011). The Fifth Circuit analyzes the prudential standing inquiry using the following five factors:

> (1) the nature of the plaintiff's alleged injury . . .;
> (2) the directness or indirectness of the asserted injury;
> (3) the proximity or remoteness of the party to the alleged injurious conduct;
> (4) the speculativeness of the damages claim; and
> (5) the risk of duplicative damages or complexity in apportioning damages.

-11-

*Id.* at 796–97 (quoting *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 563 (5th Cir. 2001)). "Although technically distinct, these five factors can be distilled into an essential inquiry, i.e., whether, in light of the competitive relationship between the parties, there is a sufficiently direct link between the asserted injury and the alleged false advertising." *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 337 (5th Cir. 2002).

The Court first concludes Defendants waived this argument by failing to raise it before a post-verdict Rule 50(b) motion. *See Bd. of Miss. Levee Comm'rs v. EPA*, 674 F.3d 409, 417 ("Unlike constitutional standing, prudential standing arguments may be waived."); *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 320 (5th Cir. 1999) (finding prudential standing argument waived when not raised "until after Ensley's case-in-chief" because argument could have been raised before trial). Defendants counter they could not raise this argument until after the evidence at trial revealed Eastman had suffered no injury. This argument is sophistic, because it ignores the most obvious avenue for challenging standing on this basis: a timely summary judgment motion filed before the parties and the Court incurred the expense of a two-week jury trial.[11]

Alternatively, the Court will briefly address the prudential standing argument because such an argument may be raised *sua sponte* at any time. *See id.* at 418 ("Although the EPA correctly points out that we have previously considered the issue [of prudential standing] *sua sponte*, . . . we decline to do so here." (citation omitted)). Considering the relevant factors, the Court finds Eastman has plainly presented sufficient evidence of injury to satisfy the prudential standing inquiry. The jury heard testimony about specific Eastman customers who were upset by Defendants' statements and

---

[11] Defendants did not raise the standing issue in their summary judgment motion.

came to Eastman demanding answers. Although an Eastman witness testified he had a 100% success rate in assuaging client concerns by showing them Eastman's testing data, Defendants' messaging nevertheless required Eastman to take ameliorative actions it would not otherwise have taken. Moreover, a reasonable juror could infer other customers had similar reactions but did not reach out to Eastman to receive the corrective messaging. Additionally, the jury heard evidence from Eastman's marketing expert about consumer confusion, and also heard evidence of the significant amount of money Eastman expended in corrective advertising fees in response to Defendants' statements. This evidence establishes a "sufficiently direct link" between Eastman's alleged injury and Defendants' statements. *Ford*, 301 F.3d at 337.[12]

Fourth, Defendants re-urge their challenges to the jury's "misleading" findings, arguing there was no evidence of either deception or materiality.[13] For the same reasons discussed above, the Court again rejects these arguments.

Fifth, Defendants raise a new challenge to the jury's finding of willfulness. A violation of the Lanham Act is willful if the defendant knows or is indifferent to whether its actions are unlawful. *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992). Defendants argue there is no evidence of willfulness because Defendants based their statements upon Dr. Bittner's published scientific paper. Defendants cite no authority suggesting reliance on a published paper categorically precludes a "willful" level of culpability. Moreover, Defendants did not simply quote or excerpt Dr.

---

[12] Defendants separately argue Eastman has failed to produce any evidence of actual injury to support an injunction. The Court rejects this argument for the same reason it rejects the nearly identical standing argument.

[13] In the Rule 50(b) context, even if Defendants were right, any relief would be purely academic; because the jury also found all three statements to be literally false, the jury was allowed to presume deception and materiality. Accordingly, Defendants would still be liable for false advertising.

Bittner's paper; instead, they redesigned a bar chart to compare Tritan with PlastiPure products (as in the brochure) and read in wholly unsupported conclusions (e.g., Tritan is harmful).

Additionally, the jury heard evidence which supported their willfulness finding. For example, the jury saw an email from Dr. Bittner prior to any testing on Tritan in which he claimed Tritan would be estrogenically active. The jury also heard testimony indicating the data underlying the brochure's bar chart told a different story, and the chart omitted data unfavorable to PlastiPure products. One of Defendants' employees even testified he did not believe the tests they used simulated "common use" stressors. From this evidence, a reasonable jury could conclude Defendants either knew their statements were false or were indifferent to whether they were false.

Sixth, Defendants challenge the sufficiency of the evidence to support the jury's verdict on all the related questions submitted to the jury (unfair competition, conspiracy, aiding and abetting). The unfair competition claim was based solely on the conduct constituting false advertising. Defendants offer no unique argument against the jury's finding on this claim, and the Court therefore denies Defendants' motion for judgment on this claim for the same reasons as the Lanham Act claim. Defendants offer no substantive attack on the jury's conspiracy and aiding-and-abetting findings, and those findings are supported by substantial amounts of evidence, including evidence of common ownership and management of the two defendant companies.[14]

Viewing the evidence in the light most favorable to upholding the jury's verdict, the Court sees no basis for overturning the jury's findings in this case. To the extent Defendants' motion seeks

---

[14] Defendants also seek judgment on Eastman's tortious interference with contract claim. This claim, however, was not submitted to the jury because there was insufficient evidence to support the claim at trial. Similarly, Defendants seek judgment on some freestanding "corrective advertising" claim, but Eastman's corrective advertising evidence was merely evidence of damages related to its false advertising claim. Additionally, Eastman chose not to request damages for corrective advertising after the Court not-so-subtly hinted it would not give the jury a damages question because Eastman's counsel began his opening argument by telling the jury Eastman was not seeking money damages in this case.

judgment notwithstanding the jury's verdict, it is DENIED. The Court thus turns to the parties' arguments over the necessity and scope of injunctive relief.

**B.      Eastman's Request for Injunctive Relief**

**1.      Eastman's Entitlement to an Injunction**

The Lanham Act specifically contemplates injunctive relief as a remedy for victorious plaintiffs. 15 U.S.C. § 1116(a).

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Defendants primarily argue Eastman has not shown it will suffer any irreparable injury, but also contest the remaining three prongs of the injunction inquiry.

The first question is whether Eastman has shown it will suffer irreparable injury in the absence of a permanent injunction. Eastman argues irreparable injury may be presumed, citing a trademark infringement case. *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (citing 5 McCarthy on Trademarks and Unfair Competition § 30:2 (4th ed. 2001)). This position strikes the Court as plainly inconsistent with the Fifth Circuit's false advertising precedent, which explicitly requires a plaintiff to prove irreparable injury "[i]n addition" to proving falsity. *Seven-Up*, 86 F.3d at 1390; *see also Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distribution Co.*, 520 F.3d 393, 402 (5th Cir. 2008). The Court therefore declines to presume irreparable injury simply because Eastman prevailed on the merits.

While a presumption is inappropriate, it would still be somewhat unusual not to enjoin an infringer from infringing in the future. *See* MCCARTHY § 27:37 ("In most cases, after a full trial finding false advertising, a final injunction is appropriate."). The classic example of when an injunction is *not* appropriate is *Seven-Up*, where the defendant had not used the challenged presentations in five years and the presentations were outdated and essentially useless at the time the injunction was requested. *Id.* n.7 (citing *Seven-Up*, 86 F.3d at 1390). In this case, although Defendants represent they have removed the press release and brochure from their website and do not plan to redistribute them, there is a undoubtedly a possibility Defendants will make similar statements in the future. *See William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 532 (1924) ("But respondent being entitled to relief, is entitled to effective relief; and any doubt in respect of the extent thereof must be resolved in its favor as the innocent producer and against the petitioner, which has shown by its conduct that it is not to be trusted.").

The jury found Eastman was injured by Defendants' statements, and the verdict was supported by the evidence. For example, the jury heard about Eastman's strained relationship with its customer Lock & Lock, a Korean company who fell from Eastman's list of "top ten customers" after it encountered Defendants' statements. The jury saw evidence indicating Defendants had communicated with numerous other Eastman customers, and Defendants' brochure was widely distributed at an industry convention. Eastman also expended roughly half a million dollars to pay for corrective advertising. Although it is difficult to measure the precise damage Eastman has or will suffer as a result of Defendants' statements, there is certainly evidence in the record to support the jury's finding of injury and suggest an injunction is appropriate. *See PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126–27 (4th Cir. 2011) (noting the difficulty of proving irreparable

harm in false advertising cases, but affirming district court's grant of permanent injunction where jury concluded defendant's statements had misled consumers and evidence showed harm to plaintiff's reputation); *id.* at 127 ("As the district court aptly noted, the injunction prevents Mead Johnson from 'infecting the marketplace with the same or similar claims in different advertisements in the future.'").

While some of Eastman's injuries would be easily compensable (e.g., its corrective advertising costs), others are not easily reduced to a damages figure. This is especially true of the ongoing potential harm if Defendants continue making similar statements through difficult-to-monitor channels, such as direct advertising via emails to customers. *See ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596–97 (5th Cir. 2003) (injunction warranted to prevent future sale of product because damages would be difficult to prove); *Fresh Del Monte Produce v. Del Monte Foods Co.*, No. 08 Civ. 8718 (SHS), 2013 U.S. Dist. LEXIS 44945, at *20–22 (S.D.N.Y. Mar. 28, 2013) (injunction warranted in false advertising case where jury found no lost sales, because the extent of injury was difficult to measure). Because the jury found Defendants' statements were literally false, the ability of those statements to impact consumers' purchasing decisions is presumed. It is likely impossible to quantify the extent of the harm Eastman has suffered as a result of Defendants' false advertisements, which weighs in favor of a finding of irreparable harm.

An injunction is also supported by the balance of the hardships. Defendants have already taken down the brochure and press releases, and indicate they have no intention to redistribute them. An injunction putting legal force behind their commitment is a minimal burden. While Defendants claim their First Amendment rights will be burdened by an injunction, they will not be prohibited from participating in scientific discussions, continuing their research, or publishing scientific articles.

An injunction will only prevent Defendants from repeating statements a jury found to be false and misleading in commercial advertisements or promotions. Finally, the public has a strong interest in the enforcement of the Lanham Act's prohibition on false advertisements, and will suffer no harm because Defendants' scientific pursuits will be unaffected by the terms of the injunction.

Moving beyond the four *eBay* factors, Defendants argue Eastman is not entitled to an injunction because it has unclean hands. In essence, Defendants seek to have this Court do what the jury did not, which is consider the merits of Defendants' improperly pleaded[15] counterclaims in which Defendants allege Eastman made various false and misleading statements about Tritan and about Defendants' testing of Tritan products. The jury was asked no questions about Eastman's conduct, and the Court is not inclined to conduct a post-jury-trial bench trial on these counterclaims to determine whether Eastman also engaged in false advertising and should therefore be barred from receiving equitable relief.

The Court therefore finds an injunction is warranted in this case. The parties disagree about the scope of any injunction, however, and thus the Court must determine the precise contours of the injunction.

## 2.     Scope of the Injunction

Eastman requests an injunction prohibiting Defendants from making any of the following four statements in a commercial advertisement or promotion:

> (1)     Tritan resins and products leach chemicals having significant estrogenic activity;

---

[15] *See* Order of June 4, 2013 [#133], at 5–6 (denying Defendants' motion for leave to file third amended answers and counterclaims ten months after the parties' chosen deadline to amend pleadings; granting Eastman's motion to exclude Defendants' evidence of damages supporting their counterclaims because Defendants failed to participate in the discovery process with respect to those damages).

(2)     Tritan, or products made with Tritan, are dangerous to human health because they exhibit estrogenic activity;

(3)     Tritan resins and products leach chemicals having significant estrogenic activity after common-use stresses; or

(4)     Defendants' use of the MCF-7 in vitro assay is a definitive final test for estrogenic activity in chemicals or substances, including Tritan.

Def.'s Mot. Judg. [#204-1], Ex. A (Proposed Final Judgment), ¶ 3. Eastman also seeks to force Defendants to engage in "corrective advertising" of their own by placing a formal retraction on their website for the next year. *Id.* ¶ 6.

Defendants argue attaching disclaimers to the press releases, brochure, and website would be a more appropriate remedy than in injunction. If an injunction does issue, Defendants request the injunction be tied precisely to the jury's findings, and explicitly state the injunction:

(1)     does not prohibit any future scientific writing or publication from Defendants (even if those future publications discuss Tritan or Tritan data, or determine whether or not a chemical or mixture of chemicals is estrogenic solely by virtue of in vitro testing); and

(2)     does not preclude Defendants from "linking" any such future publications on their websites.

Def.'s Mot. Judg. [#205], at 23. Further, Defendants want the injunction to specify it:

(1)     does not prohibit Defendants from continuing to research Tritan and commenting about their results;

(2)     does not prohibit any statements from Defendants about Tritan based on CertiChem data that do not currently exist; and

(3)     does not prohibit any statements from Defendants about Tritan based on analyses of existing CertiChem data that were never publicized, as of August 13, 2013; and

(4)     does not prohibit any statements from Defendants about Tritan based on the data of others.

*Id.* at 24.

Disclaimers are a recognized alternative to a prohibitive injunction. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 672 (5th Cir. 2000); *Better Bus. Bureau of Metro. Hous.,*

*Inc. v. Med. Dirs., Inc.*, 681 F.2d 397, 405 (5th Cir. 1982). In general, the purpose of a disclaimer is to accommodate some First Amendment interest the defendant retains despite its infringing activity. *E.g.*, *Westchester Media*, 214 F.3d at 673 (magazine had First Amendment interest "in both the use of the title and content of its ongoing publication"). Disclaimers are appropriate when a disclaimer can effectively make the presentation of particular information no longer deceptive or misleading. *See Better Bus. Bureau*, 681 F.2d at 405.

As the Fifth Circuit noted in *Westchester Media*, "speech that misleads or creates confusion is not protected under the First Amendment." 214 F.3d at 672.[16] Defendants therefore have no interest in making the statements the jury found to be false and misleading. Defendants' disclaimers seek to render the publications non-misleading, but there is no basis for concluding the modifications would remove the potential for harm other than Defendants' attorney argument. It makes sense to place at least some burden on the infringing party to show their disclaimer would effectively remedy the false or misleading statements and render them unobjectionable. *See Westchester Media Co. L.P. v. PRL USA Holdings, Inc.*, No. Civ.A. H-97-3278, 2001 WL 34109374, at *3 (S.D. Tex. Oct. 23, 2001), *aff'd*, 48 F. App'x 917 (5th Cir. 2002). Defendants' proposed disclaimers could be the subject of an entire second trial, with the expert witnesses continuing to disagree with each side's characterization of the testing methodology and underlying data. Moreover, while Eastman's direct customers are sophisticated companies with teams of scientists capable of understanding the disclaimers, the jury heard evidence Defendants intentionally targeted end-user purchasers of plastic products with the hope of convincing those purchasers to put pressure on manufacturers to use EA-

---

[16] There is also no concern about chilling "scientific expression" because Defendants were not sued for publishing scientific papers, and the injunction cannot prohibit them from continuing to do so.

-20-

free materials (i.e., something other than Tritan). It is totally unclear whether Defendants' proposed disclaimers would alleviate the downstream harms associated with unsophisticated consumers encountering Defendants' statements. The Court therefore finds an injunction is more appropriate than a disclaimer in this case.

Although an injunction is warranted here, the injunction must be narrowly tailored. *See Better Bus. Bureau*, 681 F.2d at 405 (citing *In re R.M.J.*, 455 U.S. 191, 203 (1982)). Eastman's first three prohibitions map directly to the statements the jury considered and found to be false. Eastman's fourth prohibition—"Defendants' use of the MCF-7 in vitro assay is a definitive final test for estrogenic activity in chemicals or substances, including Tritan"—does not. While this was an important issue in this case, and the jury may well have considered it in reaching its verdict, it was not a direct question the jury was asked to answer. Further, whether the MCF-7 test is definitive or not is not a statement about Tritan; it is a statement about the MCF-7 test. Including this statement in the injunction would therefore expand the scope of the injunction beyond what is reasonably necessary to enforce the jury's findings.

Defendants' requested additions to the injunction are simply not necessary. Nothing in the injunction prohibits Defendants from engaging in additional scientific research or publishing scientific papers. The jury in this case determined, based on the evidence adduced at trial, three statements Defendants made about Tritan were false and misleading. The injunction simply prohibits Defendants from continuing to make those statements in commercial advertisements or promotions. If Defendants conduct new research and believe their results show Tritan exhibits estrogenic activity, they are free to publish a scientific paper on the topic. If Defendants further believe their research

proves the statements the jury found to be false and misleading are no longer false and misleading, Defendants may seek relief from the injunction in this Court.

Finally, the Court turns to whether or not Eastman's proposed corrective advertising is appropriate. While courts have on occasion included forced corrective advertising as a part of the remedy in false advertising cases, there is no suggestion such relief is mandatory, or even presumed appropriate. *See, e.g., Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 516 (8th Cir. 1996) (district court has discretion to decide whether corrective advertising is a necessary and appropriate remedy). In this case, Eastman itself has already engaged in significant amounts of corrective advertising, and it is unclear what additional effect a digital billboard written by Eastman and posted on Defendants' website will have. Based on the record in this case, the Court is convinced requiring Defendants to stop making the statements the jury found to be false is sufficient to protect Eastman's interests and honor the spirit of the Lanham Act's protective provisions.

### Conclusion

Accordingly,

IT IS ORDERED that Defendants PlastiPure, Inc. and CertiChem, Inc.'s Motion for Judgment as a Matter of Law [#185] is DENIED;

IT IS FURTHER ORDERED that Defendants' Motion for Judgment [#205] is DENIED;

IT IS FINALLY ORDERED that Eastman's Motion for Entry of Final Judgment [#204] is GRANTED as modified above. A final judgment incorporating the Court's modifications is filed simultaneously with this order.

SIGNED this the _30th_ day of August 2013.


SAM SPARKS
UNITED STATES DISTRICT JUDGE

057 judg mots kkt.frm                          -23-